[Civ. No. 1982.   Third Appellate District.—May 9, 1919.]

WILLIAM K. GOLDEN, Appellant, v. CITY OF VALLEJO (a Municipal Corporation), Respondent.

[1] BOUNDARIES — GOVERNMENT FIELD-NOTES — DUTY OF SURVEYOR.— In establishing a boundary line, the surveyor should take the field-notes of the government surveyor and from the details therein endeavor to fix the line precisely as it is called for by them; and if by so doing the line can be located, this must be done, and when so located it must control. The surveyor is not authorized to correct what the government has done.

[2] ID.—CONFLICT BETWEEN FIELD-NOTES AND PHYSICAL MONUMENTS —PRIORITY.—While the field-notes of the government surveyor are to be accepted as presumptively correct, yet, under subdivision 2

1. Conclusiveness of boundary lines run by government surveyors, note, 110 Am. St. Rep. 677.

41 Cal. App.—8

of section 2077 of the Code of Civil Procedure, when permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount.

[3] ID.—QUANTITY OF LANDS IN ADJOINING TRACTS—MAINTENANCE OF EQUALITY.—While consideration of the quantity of land in adjoining tracts is of little importance in the determination of the boundary line between them, yet, where such tracts are supposedly equal subdivisions, the fact that if the line were located where contended for by one of the parties the tracts would be very unequal in quantity, would strongly confirm the action of a trial court in disregarding such location in favor of another which would maintain the equality.

[4] ID.—LOCATION—QUESTION OF FACT—FINDING.—The whole question concerning the location of a government corner is one of fact, and a trial court having determined it, that ends the matter so far as an appellate court is concerned, provided there is substantial evidence to support the trial court's conclusion.

[5] ID.—AGREED LOCATION—NOT BINDING AS TO OTHER PROPERTIES.— The fact that certain adjoining property owners acquiesce and agree upon the location of a certain corner and to the boundary line between their parcels of land, though binding upon them and their successors, will not preclude one not a party to such agreement from contesting its accuracy with reference to an entirely different tract of land.

APPEAL from a judgment of the Superior Court of Solano County. R. H. Latimer, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

James H. Boyer for Appellant.

L. G. Harrier for Respondent.

BURNETT, J.—The action is in ejectment, and the vital question relates to the title to a strip of land through which flows a creek into a reservoir belonging to the water system of the city of Vallejo. Appellant owns the northeast quarter of the northeast quarter of section 9, township 5 north, range 3 west, M. D. M., and the respondent owns the quarter directly east. The controversy is over the boundary between these subdivisions, and the only point in dispute is as to the location of the northeast corner of Golden's property. Appellant claims that a certain mound of rock called the "O'C Corner" (or O'Connor Corner) is the proper point; while

respondent insists that the lower court was justified by the
evidence in finding that the true corner is on the other side
of the creek, where it was located in 1892 by E. N. Eager,
the county surveyor of Solano County.

The following diagram illustrates these points and also the
disputed tract of land, being about 180 feet in width and a
quarter of a mile in length:

The said water-way is of great importance to the city of
Vallejo and it has been used as a part of its water system

since 1892. No doubt this was known to Golden when he took up his part of the section in 1907 and he must have been familiar with said Eager corner and the claim of the city to this disputed tract. He waited, however, till 1914 before questioning the city's right and title to the property. This circumstance is not decisive, though, as neither estoppel nor prescription is claimed, but it can hardly be ignored in the consideration of the good faith of the parties.

Independent, however, of any delay by either party in claiming title, we are satisfied after a careful reading of the entire record that there is sufficient support for the court's finding that said northeast corner of appellant's land is located on the western side of the creek, substantially as testified to by said Eager.

The question is to be determined largely by a consideration of the expert evidence, the testimony of the surveyors who were called by the respective parties. It may be admitted that some support is furnished for appellant's theory, that the said "O'C Corner" was established by the original government survey as the common corner of said sections 3, 4, 9, and 10. There is some evidence that it was so recognized in the community for many years, and the testimony of plaintiff, himself a surveyor, O. H. Buckman, county surveyor of Napa County, and Surveyor B. L. Mincher rather favor appellant's view; but it is somewhat significant that in the testimony of Mr. Golden are found the following statements: "I made notes of this survey [his survey of the grounds], but, I did not make a map of it. I have not these notes here, I don't know where they are. . . . The surveying work that I did there is not in accordance with the government rules for establishing lost corners." Mr. Buckman, also, admitted: "I have not the notes of the survey I made for Mr. Golden. I have mislaid them and cannot find them."

On the other hand, it is apparent that Mr. Eager and T. D. Kilkenny, city engineer of Vallejo, who made surveys of the premises, submitted full notes of their work and were thoroughly examined and cross-examined by the court and the parties.

Of course, this circumstance is not to be unduly magnified, but it could hardly be disregarded in viewing the conflicting testimony of said experts. Manifestly, we are not called upon to say whether the testimony of plaintiff's experts would have

supported a conclusion in favor of his theory, but to determine whether there is any substantial support for the adverse finding of the court.

As to this ''O'C Corner'' Mr. Eager testified: ''It had marks on it and they were not government markings. It was a stake with O'C on it. If I had not made any survey at all and just came across that mound of rocks when I first made my survey in 1887, there was plenty about it to show me that it was not the government corner. The stake itself was a redwood stake, and it was a flat board and the government corners are always stakes larger than a flat board. . . . The mound of stones at the O'C corner was smaller than the government builds for the section corners. . . . It was not the government corner because government corners are never marked in the way this was.''

And as to this, plaintiff himself testified: ''The O'C corner consists of a pile of rocks with a stake in it marked 'O'C.' The letters O. C. are cut into the stake. I first saw the O'C corner with the same stake in it over twenty years ago. I am familiar with the manner in which section corners are marked by government surveyors. The O'Connor corner is not marked in that manner.''

Clearly, the foregoing furnishes some evidence that the monument placed at said point was not the work of the government surveyor. It is not conclusive, but in the absence of any positive evidence as to who placed said flat board and rocks, it is a circumstance tending to show that it was the work of another than the government surveyor and that it was done at a different time from the original survey, it being a fair inference that the government surveyor would pursue the usual course of the official surveyor in marking the corner. Or, if it be assumed that the original monument was destroyed or effaced and another put in its place by the government surveyor or someone else acting in good faith, it is not unreasonable to expect that the substituted monument would conform as nearly as possible to the original. We are to keep in mind that it is a question of probabilities whether the so-called monument or any monument was placed at that point by the government surveyor, and said circumstance was of some importance in determining that question. In other words, it is less probable that it was a government monument by reason of the fact that its construction was so different

from the usual government monument that marks the corner of a township.

Another circumstance of greater significance is, that it does not conform to, but rather contradicts, the calls of the original field-notes. These notes show that when the surveyor in 1863 ran north between sections 9 and 10, he set the corner post for 3, 4, 9, and 10 amidst some live-oak trees. Then running east between sections 3 and 10, he crossed the creek at 3 chains. That is, he had to run east from the corner to reach the creek. If we are, therefore, to give effect to this original report of the government surveyor, we must place the corner on the west of the creek, but the O'C corner is on the east side.

As to this Mr. Buckman testified: "I recall that the field-notes of the government survey say that you left the post and crossed the creek three chains east of the post. You could not do that if the O'Connor Corner is the corner location. The O'Connor Corner is east of the creek while the corner referred to in that part of the field-notes would be west of the creek."

Again, there is no chamisal at the O'Connor corner, whereas the field-notes say that the surveyor in leaving the corner established by him left the "Chamisal at post." As to this Mr. Eager testified: "There was chamisal near the post that I set and west of it. Chamisal is very scattering directly east of the post and as you approach the creek it disappears altogether. I am familiar with the location of the O'C corner and there is no chamisal anywhere near it, and there never was any chamisal near it to my knowledge. I located first in 1892 and I didn't find any there. I didn't find any there in 1887." Mr. Golden admitted this in his testimony: "There is no chamisal right around the O'C point; there is chamisal around the Eager corner."

The field-notes also say that the corner was at a certain distance and angle from certain live-oak trees 18 and 20 inches in diameter. As to this Mr. Eager testified: "I could not find the live-oak 18 inches in diameter referred to in page 5 of the government field-notes, or any stump or anything to correspond. I could not find any of the heavy trees or stumps near the O'C Corner called for in the government field-notes. I made a search for them."

Again, on the line running south from the government corner, the field-notes say there should be three creek crossings.

From the O'C corner a line running south to the southeast corner of section 16 would not cross the creek at all. The testimony of the surveyors shows this beyond controversy. Plaintiff testified: "If I drew a line from the O'Connor Corner south to the southeast corner of section 9, I would not cross the creek before I got to the lake. The creek would be on the west side of the line." Mr. Kilkenny's testimony is: "A line running south from the O'C Corner does not cross the creek at all; did not come within a chain of it. It runs east of the creek." There are some other particulars in which the O'C corner does not correspond with the calls of the original government survey, but we need not specify them.

[1] As to the significance of the field-notes in the determination of such questions there can be no controversy. In the case of *Yolo County* v. *Nolan,* 144 Cal. 448, [77 Pac. 1007], speaking of the duty of a surveyor, in his effort to establish boundary lines, the supreme court said: "The field-notes should be taken, and from the courses and distances, natural monuments or objects, and bearing trees described therein the surveyor should endeavor to fix the line precisely as it is called for by the field-notes. He should endeavor to retrace the steps of the man who made the original survey. If by so doing the line can be located, it must be done, and, when so located, it must control. It is not the business of the surveyor to speculate as to whether one government subdivision is short and the other long in acres. He is not authorized to correct what the government has done."

[2] Of course, there are certain established rules for the interpretation of the field-notes that must be applied in proper cases. One of these upon which appellant insists is contained in subdivision 2, section 2077, of the Code of Civil Procedure, as follows: "When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount." The application of this rule, however, presupposes that the monument at the O'Connor corner was placed there by the government surveyor to mark the corner. But that was not established, and the court, in view of all the evidence, was justified in rejecting that theory. As we have already seen, there were some circumstances favoring appellant's view as to that monument, but, in view of the whole record, the probabilities are decidedly the other

way. At least—and that is as far as we are required to go—in consideration of the rule that the field-notes of the government surveyor are to be accepted as presumptively correct and may be overcome only by a preponderance of evidence that the surveyor actually established the corner monument at said O'C corner, and that the burden of proof was upon plaintiff to show that said stake and monument are those of the original surveyor, and, also, that they were intended to locate the designated boundary of such survey (*Pauly* v. *Broadnax*, 157 Cal. 395, [108 Pac. 271]), we cannot hold that the court erred in rejecting said O'C monument as controlling.

[3] Other important circumstances are disclosed by the record that tend to justify the court's position in reference to the O'Connor corner. Among these is the fact that if it were accepted as the true location, the Golden tract would contain 45½ acres instead of the normal area of 40 acres and the city's corner, lying across the creek and adjacent to Golden's land, would be reduced to 34½ acres. Of course, consideration of quantity is often of little importance in the determination of boundary lines. Frequently, other tests are more significant and satisfactory, but, under the peculiar circumstances of this case, the disparity between these supposedly equal subdivisions which would thereby be created strongly confirms the action of the court in rejecting the said O'C corner.

It was manifestly the intention of the government surveyor to make these respective subdivisions as nearly equal as possible, and this intention might properly be regarded as a decisive factor in the rejection of appellant's claim, though otherwise, the evidence might be deemed sufficient to uphold it. In this connection it may be recalled that the practice in making the government survey of a township is to begin at the southeast corner and proceed from the south and east toward the north and west, and the general rule is that any deficiency in the section or fractions thereof attaches to the last part of the survey. Theoretically, at least, the interior sections, such as 9 and 10 included herein, must contain the full number of acres called for. A stronger showing than was made by appellant would be required to justify the trial court in ignoring the presumption that the government surveyor performed his duty properly in accordance with the general custom in such matters.

Respondent calls attention to some other circumstances tending to discredit the O'Connor corner, but it should not be necessary to notice them all specifically.

As to the so-called Eager corner, it was established by the said county surveyor of Solano County upon the theory that it represented what is known as a "lost corner." He testified that he applied the rule of "proportionate measurements." Whatever criticism may be made of the particular method that he pursued in locating the corner, there can be no doubt that the evidence is sufficient to warrant the conclusion that it is substantially in accordance with the original survey.

[4] As said in *Howard* v. *Cunningham*, 36 Cal. App. 229, [171 Pac. 976, 978], concerning the location of a government corner: "The whole question is one of fact and the trial court having determined it, that ends the matter so far as an appellate court is concerned." This, of course, is to be taken with the qualification that there is substanial evidence to support the trial court's conclusion, and of that there can be no doubt herein. Manifestly, there were several slight mistakes made by the government surveyor and there are some inaccuracies in his survey. But there is much stronger reason for accepting the Eager corner than the O'C corner. It corresponds more closely with the calls of the survey than does the other. It is true that it does not meet every requirement, but it seems reasonable and probable that it is practically at the point selected by the original surveyor. Respondent, in its brief, follows carefully the survey of Mr. Eager and points out step by step how it conforms substantially to the calls of the original field-notes. As before stated, the weight of the evidence is decidedly in favor of his survey, although on the line running north the O'C corner comes nearer satisfying the call as to natural monuments than does the Eager corner. But, as stated by respondent, as to this course, neither of the rival corners fits the government field-notes with exactness. Therein a mistake was probably made in the original survey or in the record made of it, as pointed out by Mr. Eager. Be that as it may, we cannot hold that this difficulty affects in the slightest the finding of the lower court.

Much is said in appellant's brief as to monuments and the rule that gives them precedence over courses and distances.

Special emphasis is laid upon the requirement of the field-notes as to certain creek crossings, and it is claimed that due consideration was not accorded to this circumstance. But as to that appellant is mistaken.

Mr. Eager's explanation along that line seems quite reasonable and satisfactory. He said: "The principal reason I had for not accepting the O'C corner as the common corner of 3, 4, 9, and 10 was that it was on the wrong side of the creek. The government field-notes stated that it was three chains to the west of the creek, while as a matter of fact the O'C Corner was east of the creek. It did not correspond with the check of the government notes; those were the reasons that time, and besides, I checked the course of the creek. The course of the creek south of the O'C Corner did not correspond with the government field-notes. The O'C Corner would not check with the notation in the field-notes which reads: 'Running north between sections 9 and 10 on a variation of $16\frac{1}{4}$ degrees east of 49.50 chains across creek 25 links wide, course southwest enter chamisal.' The line which I established does correspond with this course, that is another reason for leaving the corner where I did. The O'C Corner does not correspond with the measurements east and west, nor with the proportional measurements. The field-notes stated that the corner was three chains to the west of the creek, and I considered that I had got approximately that distance. There was a crossing of the creek at three chains south of the corner which I re-established, which corresponded with the government field-notes, and the line also corresponded with the government field-notes running north. . . . There is a much better monument right there than the statement of a surveyor that he followed the bed of the creek for a thousand feet practically north and south and that is the statement of the government surveyor that he commenced at the section corner to 3, 4, 9, and 10 and ran on a line east and at some place he crossed the creek. He says that on the line running east he positively crossed the creek at right angles. There is a discrepancy, but I think the statement that at three chains he crossed the creek running there is much more positive than that he got into the creek-bed and ran along it. . . . That is the reason I discarded the O'C Corner and re-established the corner in a different way. If the Buckman line which runs

north a thousand feet to the bed of the creek is extended south it should attach itself to the southeast corner of section 16; but this line running south does not correspond in any respect with the field-notes. It is a blank compared with the government field-notes for the two miles south. If I were of the opinion that it might be the correct line by north, a description of it in accordance with the field-notes from the south would show that it was absolutely wrong.'' He further points out that the O'C corner fails to meet the situation as to the east and west courses and distances.

Mr. Eager's testimony seems clear and comprehensive and it can leave little doubt, if any, that appellant has no legal title to the property in dispute.

We can see no merit whatever in the claim that respondent, by reason of acquiescence or estoppel, is precluded from disputing the correctness of the O'Connor corner.

[5] It seems that in 1887 Mr. Eager was called upon to run a line between the lands of Nelson and Madison in the northerly half of sections 3 and 4. It is true that Mr. Eager at that time assumed the O'C corner to be the true government corner. It was so represented to him by Mr. Nelson and he proceeded upon that basis. There was no question raised as to its accuracy. But it is manifest that the acquiescence and agreement of Nelson and Madison as to said corner and to the boundary line between their parcels of land, conceding that it would be binding upon them and their successors, would not preclude the city of Vallejo from contesting its accuracy in reference to an entirely different tract of land. Different tracts are in controversy here and, therefore, a different line, and, moreover, the United States then owned the land now owned by appellant and the United States was not a party to the proceeding. It will not be disputed that ''an agreement cannot be extended by implication or otherwise to boundaries not considered in the agreement'' (*Grants Pass Land Co.* v. *Brown*, 168 Cal. 456, [143 Pac. 754]), and, furthermore, ''A survey for the purpose of establishing a boundary line, made between a sole owner of the land on one side, and one of the several owners of the land on the other side, does not estop the owners who did not join in it.'' (*Spring* v. *Hewston*, 52 Cal. 442.)

We are satisfied, not only that the findings of the lower court are supported, but that the equities in the case are with respondent.

The judgment is therefore affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on June 7, 1919, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 7, 1919.

All the Justices concurred, except Melvin, J., and Olney, J., who were absent.