[Civ. No. 22335. Second Dist., Div. Two. Nov. 12, 1958.]

DAWN CHANDLER et al., Appellants, v. FREDERICK H. HIBBERD et al., Respondents.

Hanna & Morton, Harold C. Morton, James M. McRoberts, John H. Blake and Julien Francis Goux for Appellants.

Mortimer A. Kline, Edgar T. Zook, John E. Troxel, Joseph A. Ball, Clark A. Haggeness, Griffith & Thornburgh, Laselle Thornburgh, M. F. Schade, O'Melveny & Myers, Sidney H. Wall, Rodney K. Potter, Richard B. Ragland and Louis W. Myers for Respondents.

FOX, P. J.—The basic question for determination in this case is the correct location of the common boundary line between two oil producing properties. Being aggrieved by the decision after an extended trial,[1] plaintiffs have appealed from the judgment and from the order denying their motion to tax costs.

The properties in question are in the South Cuyama Valley oil field in Santa Barbara County. More specifically, they are the south one half of Section 25 and Section 36 of Township 10 North, Range 27 West, S.B.B. & M. The controversial line separates these two sections. Section 25 lies directly north of Section 36. Both sections are bounded on the east by the range line that divides said township from Township 10 North in Range 26 West. (See illustrative diagram on next page.)

The plaintiffs are the Superior Oil Company, herein referred to as Superior, as lessee, and the owners of the fee and royalty interests in the south half of Section 25. The defendants are Richfield Oil Corporation, herein referred to as Richfield, as lessee, and the owners of the fee and royalty interests in the whole of Section 36.

In their opening brief plaintiffs state their position as follows: "It was plaintiffs contention that the true boundary line between Section 25 and Section 36 was lost. It was also plaintiffs' contention that the north boundary of Section 25 and south boundary of Section 36 could be relocated on the ground but that the distance between the north boundary of Section 25 and the south boundary of 36 was approximately 660 feet less than the distance specified in the official government plat." Plaintiffs then contend that this longitudinal shortage of these two sections amounting to ten chains[2] or 660 feet, should be apportioned equally between them. This would result in a boundary line approximately 330 feet south of a fence claimed as a dividing line by defendants. Thus the

---

[1]The trial consumed some 340 days. The record consists of a clerk's transcript of 617 pages, a reporter's transcript of 36,302 pages, 844 exhibits, and briefs that total 1,072 pages.

[2]A chain is 66 feet. There are 80 chains in a mile.

N

| | |
|---|---|
| CUYAMA | RANCHO |
| T.10 N. R. 27 W. | T.10 N. R. 26 W. |

30 29 28 27 26 25

31 32 33 34 35 36

W RANCHO E

CUYAMA

T. 9 N. R. 27 W. T.9 N. R. 26 W.

S

real purpose of this litigation is to establish the east-west line that constitutes the common boundary of the two sections.[3]

When oil was discovered in the area the exact location of the boundary line became important. Superior, which had the south half of Section 25 under lease, employed one Myers to make a survey. The monuments marking the northeast and northwest corners of Section 25 were missing. Those corners were either obliterated or lost. Myers accepted as the *north* boundary of Section 25 an old fence known as the Caliente fence which had been erected by the owners of Cuyama Rancho, which adjoins Township 10 North, Range 27 West on the east and north. This resulted in the asserted shortage of 660 feet in the north-south boundary of Sections 25 and 36.

[3]Early in the trial it was stipulated that ''the court shall adjudicate in its judgment entered herein the common boundary line between the South half of Section 25 and Section 36, Township 10 North, Range 27 West S.B.M., or the common boundary between the parcels of the respective parties.''

Plaintiffs' primary cause of action[4] is one to quiet title to the south half of Section 25 with a certain described boundary line which was determined by application of the principle of apportionment. Defendants denied the location of the boundary line contended for by plaintiffs and alleged the true boundary line to be north of that claimed by plaintiffs, at a location substantially the same as that finally determined by the court to be the true line. Certain defendants, among them Richfield and the Hibberds,[5] alleged affirmative defenses of agreed boundary, both on the theory of an actual agreement and one implied by acquiescence, and boundary by estoppel and adverse possession.[6]

The court rejected plaintiffs' theory and claimed location of the boundary line and sustained the position of defendants as to its location on the basis that "the agreed boundary and boundary by estoppel" established the controlling boundary between the parties to this action. The court made what might be termed a secondary or alternate finding by which it determined the true line to be one lying north of the so-called agreed boundary and particularly described it.

The pertinent portions of the judgment are these: "1. The boundary between Sections 25 and 36, Township 10 North, Range 27 West, S.B.M., as established by the controlling United States survey of said sections made by the United States Deputy Surveyor J. R. Glover,[7] is located along and upon a straight line passing through the following two points: . . . [here follows detailed description] and but for the existence of the agreed boundary and boundary by estoppel hereinafter established as the controlling boundary as between the parties to this action, said boundary established by said United States survey is the boundary between said Sections 25 and 36, and the boundary between the parcels of the respective parties.

"2. As between all the parties hereto, the boundary between Sections 25 and 36, Township 10 North, Range 27 West, S.B.M., and the boundary between the parcels of the respective parties, is a straight line passing through the following two points: . . . [here follows detailed description of the so-

---

[4]Other causes of action are not involved in this appeal.

[5]The Hibberds are the fee owners of Section 36.

[6]The judgment was not based on adverse possession hence the evidence on that theory need not be explored.

[7]The Glover survey was made in 1881 and 1883. This was prior to any patent being issued to a private owner covering either of these sections.

called agreed boundary which follows a certain fence known as the Johnston fence]." Plaintiffs challenge both portions of the judgment and argue that the evidence is insufficient to support the essential findings.

SUFFICIENCY OF THE EVIDENCE TO SUSTAIN THE FINDINGS
RE AGREED BOUNDARY AND BOUNDARY BY ESTOPPEL

Plaintiffs persuasively argue that the finding of agreed boundary is not supported by the evidence because there was in fact no agreement upon the Johnston fence as a boundary line marker. With respect to paragraph 2 of the judgment, Richfield states: "Defendants pleaded the defenses of agreed boundary, estoppel and adverse possession and submitted the evidence with respect thereto. . . . . This defendant will not in this brief argue the sufficiency of the evidence to support those findings, for we are satisfied that the true boundary determination contained in Paragraph 1 of the judgment is a proper and just disposition of this case in view of this present appeal, and desire that such determination shall become effective." This amounts to confession of error with respect to the finding of an agreed boundary. Hibberds and other owners of interests in Section 36 join plaintiffs in arguing affirmatively that the evidence does not support the finding of agreed boundary. This, of course, constitutes a confession of error.

The facts with respect to this issue may be briefly summarized. Beginning about 1920, Eugene Johnston was lessee of both Section 36 and the south half of 25. He used these properties for grazing cattle and for carrying on some farming. In 1938 he desired to erect a fence around Section 36 for the purpose of controlling his cattle and preventing other cattle from invading his grazing land. He had a survey made by one McGregor who started from the southwest corner of Section 36 and came to a monument about seven-eighths of a mile to the north which he thought to be the government marker and the northwest corner of Section 36. He then proceeded farther north to the Caliente fence and concluded it was located ten chains short of the true northwest corner of Section 25. Johnston reported these facts to the lessor of Section 36, Standard Investment Company. Mrs. Flora Overton, as executrix of the deceased owner thereof, was Johnston's lessor of the south half of Section 25. Through his wife Johnston wrote Mrs. Overton: "That Mr. Johnston wanted to erect a fence to control his cattle—to prevent them

from grazing on Section 25 until Mr. Johnston wanted them to—that was the object in building the fence; that if he made the fence one mile long it went about ten chains (660 feet) on her property—that Mr. Johnston wanted to notify her that it went on her property according to their surveys." According to Mrs. Johnston's testimony she replied as follows: "She (Mrs. Overton) told us to complete the fence to control the cattle and use posts from her junipers 'as long as he did not make a boundary line between the two properties, as long as he did not establish that line himself.' " Without further discussion the fence was built. After its completion Mrs. Johnston wrote Mrs. Overton advising her of that fact; she further testified that "it was on her property as far as we knew and she knew at the time." The evidence being undisputed does not support the finding of agreed boundary, for the simple reason that the fence was neither agreed upon nor intended *as a boundary* but was considered and understood as only a cattle barrier. ■ On this point the statement of the court in *Talmadge* v. *Moore,* 98 Cal.App.2d 481, at page 484 [220 P.2d 588], is apposite. The court there stated: "Where, as here, the acquiescence in the fence was as a barrier and not as a boundary line, no agreed boundary line was established. [Citation.] ■ Furthermore, an intention to accept the marked boundary as the true boundary must be shown. [Citation.]" (See also *Copley* v. *Eade,* 81 Cal.App. 2d 592, 593 [184 P.2d 698]; *Dauberman* v. *Grant,* 198 Cal. 586, 592 [246 P. 319, 48 A.L.R. 1244]; *Southern Counties Gas Co.* v. *Eden,* 118 Cal.App. 582, 585 [5 P.2d 654]; *Pedersen* v. *Reynolds,* 31 Cal.App.2d 18, 25 [87 P.2d 51].)

■ From the foregoing it is clear that the evidence is insufficient to support the finding of an agreed boundary along the Johnston fence either on the theory of an actual agreement or one implied by acquiescence.

Without going into the evidence in detail it may safely be stated, particularly in view of the concessions of defendants, that the evidence is insufficient to support the findings (1) that the owners of the south half of Section 25 are estopped to assert that the correct boundary is south of the Johnston fence; and (2) that the owners of Section 36, by adverse, hostile and open possession since 1938, have acquired title to all land south of that fence.

Since the findings on the foregoing issues are lacking in evidentiary support it follows that the judgment must be modified accordingly (*Joughin* v. *West,* 110 Cal.App.2d 159, 165

[242 P.2d 112]) by striking the portions thereof that are based on such unsupported findings.

## DETERMINATION OF OTHER ISSUES

Plaintiffs contend that "the judgment in this case adjudges solely and only" that the boundary between these sections is that found by the trial court to be established as an agreed boundary and boundary by estoppel (hereinafter designated for convenience as the agreed boundary). Also, plaintiffs insist that by reason of their appeal defendants cannot gain more than they would have taken through a straight affirmance of the judgment. Plaintiffs point out that rejection of the agreed boundary line moves the adjudicated boundary substantially northward upon their property. They argue that this is unfair. There is no merit in either of these contentions.

In their amended complaint plaintiffs asked that defendants "be required to set forth the nature of their claims . . . and that all of such claims of defendants which are adverse to plaintiffs be determined by decree of this court." The court was also asked to "ascertain and determine the common boundary between Sections 25 and 36." In addition to their affirmative defenses of agreed boundary, estoppel and adverse possession, defendants alleged that the boundary as originally surveyed could be reestablished with reasonable certainty at a location substantially northerly of the Johnston fence line. It is thus clear that the location of the true or original boundary was an issue raised by the pleadings. Such issue was recognized by all counsel and by the court. It was exhaustively litigated. In fact, the record indicates that this issue consumed the greater portion of the time of the trial. The court very properly made findings on that issue. (See *Vowinckel* v. *N. Clark & Sons,* 217 Cal. 258 [18 P.2d 58]; 13 Cal.Jur.2d 542.)

On this appeal plaintiffs recognize that the location of the original boundary line between the two sections is an issue. They point out that, "The trial court divided its judgment in two portions, by which it first held that the originally surveyed boundary line between Sections 25 and 36 can be relocated, and secondly held that such boundary was not binding between the parties because of an agreed boundary. *It is therefore necessary, in appealing from the judgment, to attack both portions.*" (Emphasis added.) They devote the second volume of their brief (320 pages) to an attack upon

the first portion of the judgment. We fail to perceive any unfairness in the procedure followed in this case.

The judgment declares that the true line is located to the north of the line found to be the agreed boundary. If the parties did not make any such agreement, sound procedure dictates that defendants be permitted to show not only that there is no agreed line but where, in fact, the true boundary is located. This is in harmony with the principles of the proper administration of justice which require the expeditious determination of a cause that has been thoroughly tried, thus avoiding unnecessary waste of time and expense in further litigation.

In this connection plaintiffs argue that the court made conflicting findings and has thus failed to make a definite disposition of all issues; and that this is an alternative judgment which is not sanctioned by precedent or statute. Although not expressly so stated, plaintiffs apparently mean to imply that the findings relative to an agreed boundary and those establishing the original survey location between these two sections are contradictory. There is, however, no inconsistency in determining as a fact that the original survey boundary is located in one position and that there is an agreed boundary in another. If the agreed boundary were upheld, it would simply supersede the original survey line as between the parties and their successors. (See *Vowinckel* v. *N. Clark & Sons, supra.*) Its location, however, has no bearing upon where the original boundary is in fact located. Here the controlling effect of the true boundary line is made conditional upon the elimination of the agreed line. There is, therefore, no possible conflict between the two findings, and no uncertainty as to the determination of any issue in the case.

The legal priorities between an agreed boundary and the original surveyed boundary line is one that permits the use of an alternative or contingent judgment. The agreed boundary is controlling if the judgment establishing it becomes final, otherwise a determination of the original boundary line is required. The use of the alternative or contingent form of judgment is proper under such circumstances. A judgment in this form has the practical advantage of eliminating subsequent litigation as to the location of the true boundary in the event, as here, the findings relative to an agreed boundary are not sustained. Such disposition of a cause has been sanctioned in this state. (*Henigson* v. *Bank of America,* 32 Cal.2d 240, 243-245 [195 P.2d 777] ; *Fageol T. & C. Co.* v. *Pacific Indem.*

*Co.,* 18 Cal.2d 748, 753-754 [117 P.2d 669].) In the Henigson case the court reviewed an alternative judgment, found the basic premise of the judgment to be erroneous and proceeded to consider the alternative determination (p. 245). (See also 28 Cal.Jur.2d, § 69, p. 704; 30A Am.Jur., § 120, p. 239; *Peterson* v. *Overson,* 52 Ariz. 203 [79 P.2d 958, 959]; *Donaldson* v. *Greenwood,* 40 Wn.2d 238 [242 P.2d 1038, 1046]; *Black* v. *Burd* (Tex.Civ.App.), 255 S.W.2d 553, 557.)

LOCATION OF TRUE BOUNDARY LINE

The controlling survey is that of United States Deputy Surveyor, J. R. Glover, made in 1881 and 1883. He subdivided that portion of Township 10 North, Range 27 West, which was not included in the Cuyama Rancho (previously patented) and which lay south and west of it. The establishment of corners, boundaries and subdivisions of Sections 25 and 36 was a part of this work. All parties claim under patents which incorporate by reference the Glover plat and survey and thus make the plat and field notes a part of the description of the land granted. (*Foss* v. *Johnstone,* 158 Cal. 119, 128 [110 P. 294]; *Kimball* v. *McKee,* 149 Cal. 435, 457-458 [86 P. 1089].)

The markers set by Glover to establish the northwest and northeast corners of Section 25 have long since disappeared. In asserting a longitudinal shortage of 660 feet in the two sections, plaintiffs have insisted throughout this case that the other two corners of Section 25 which constitute the termini of the common boundary between Sections 25 and 36 must be reestablished as lost corners by proportional measurement. It is settled law that that method, which redistributes an excess or shortage proportionately between all owners along the particular line, "must not be resorted to unless all other prescribed methods fail." (*Verdi Dev. Co.* v. *Dono-Han Mining Co.,* 141 Cal.App.2d 149, 154 [296 P.2d 429].) It is not to be used "if the line can be retraced as it was established in the field." (*County of Yolo* v. *Nolan,* 144 Cal. 445, 448 [77 P. 1006].) On this question the court stated in *Weaver* v. *Howatt,* 161 Cal. 77, 84 [118 P. 519]: "If the exact spot cannot be found, it [the court] must, if possible, decide from the data appearing in evidence its approximate position, and the proportional method is to be used only when no other reasonable method is possible and it must be so used that it does not contradict or conflict with the official data that are not impeached, and which, when not impeached, confine the actual position within certain limits. The appli-

cation of the proportional method must, in that case, be also confined to the same limits.'' The court in the instant case found these corners to be obliterated, not lost, and the evidence sustains the finding.

In *Hammond Lbr. Co.* v. *Haw*, 96 Cal.App. 390, 394 [274 P. 386], it is stated: ''The law is well established that the obliteration of a monument made in a survey does not destroy such survey nor justify a court in disregarding it where enough data remain to locate the place occupied by the monument by reference to the naturel objects referred to in the survey. Nor does such obliteration justify the adoption of the proportionate method of locating a common corner as a lost corner, where the fieldnotes refer to certain natural objects which can be found along the line mentioned so as to approximately locate it.''

''For the purpose of this distinction an obliterated corner may be defined as one of which no visible evidence remains of the work of the original surveyor in establishing it but of which the location may be shown by competent evidence. A lost corner is one which cannot be replaced by reference to any existing data or sources of information, although it is not necessary that evidence of its physical location may be seen or that one who has seen the marked corner be produced. So, it will not be regarded as a lost corner where it may be located by field notes referring to discoverable natural objects.'' (11 C.J.S., § 13b, p. 554.) Of course, plaintiffs' effort to fix the corners in this manner was merely a means of establishing them at the line approximately 330 feet south of the Johnston fence, thus showing a shortage in the north-south boundaries of Sections 25 and 36, and a consequent shortage in the land area. There must be a proved surplus or shortage in the boundary before apportionment of the land areas can be made. (8 Am.Jur., § 70, p. 795, § 71, p. 796; 11 C.J.S., § 124, p. 737, § 125, p. 739; 97 A.L.R. 1227 (anno.).) In other words, the *north* boundary of Section 25 must be so located as to create a 660 foot shortage in the *east* and *west* boundary lines of Sections 25 and 36. As a complement to their attempted relocation of corners by apportionment plaintiffs, through their surveyor witnesses, assumed and asserted the Caliente fence to mark the north line of Section 25 and supported that thesis by certain professed monumentations, recommendations, corner accessories and relocations which they had produced through their own surveys, calculations, inspections, and so forth. The court found that they

were not actually relocations of corners or corner accessories of the Glover survey and that they are not located in the positions of Glover's corners or accessories. The court also found that "[t]he assertion made on the part of plaintiffs that there is a 10-chain shortage between the north lines of Sections 25, 26 and 27 and the south line of Township 10 North, Range 27 West, S.B.M., and a shortage of 10 chains between corner No. 25 and corner No. 26 of the Cuyama Rancho is not true." (The south line of Township 10 is coincident with the south line of Section 36 thereof; corners 25 and 26 of the Cuyama Rancho are on the easterly range line of Township 10 and represent the southeast corner of Section 36 and the northeast corner of Section 25 respectively.)

Plaintiffs assert that the court must accept their north line of Sections 25, 26 and 27 because defendants did not undertake to fix that line. This situation grew out of the stipulation that the court need not determine any of the boundaries of Sections 25 and 36 except the common and disputed one. The court not being required to fix that north line, defendants were not obligated to prove its location. Plaintiffs' evidence of that location was rejected by the court as not credible; this was the exercise of a well known perogative of the trial judge. (See *Arais* v. *Kalensnikoff*, 10 Cal. 2d 428, 432 [74 P.2d 1043, 115 A.L.R. 163]; *Huth* v. *Katz*, 30 Cal.2d 605, 608-609 [184 P.2d 521]; *Odenthal* v. *Lee*, 113 Cal.App.2d 666, 669 [248 P.2d 937].) There being no north line established for Section 25, the alleged shortage in the longitudinal boundaries disappears and with it the sole basis for relocation of the corners or the south line of Section 25 through the apportionment process. The trial judge spent 21 days "making field inspections and taking 'views' of the respective properties described in the pleadings,—the terrain surrounding such properties both in the township in which they are located and adjoining townships,—monuments, artificial and natural, admitted to be or claimed to be either those of original government surveyors (or remonumentations thereof) or of 'local' surveyors,—topography claimed to be or claimed not to be called for in the official notes of government surveyors,—the claimed or admitted location of the corners and lines of many surveys, both official and private, fences, bearing trees, . . ."

This, of course, revealed independent evidence of anything that a visual inspection would disclose. (*Gates* v.

*McKinnon,* 18 Cal.2d 179, 182-183 [114 P.2d 576]; *Neel* v. *Mannings, Inc.,* 19 Cal.2d 647, 654 [122 P.2d 576].) As the result of thus applying conflicting expert testimony to the Glover survey, the court located the northwest and northeast corners of Section 36 (southwest and southeast corners of Section 25) and expressly found: "15. . . . The position of the northwest corner of Section 36 (southwest corner of Section 25), Township 10 North, Range 27 West, S.B.M., thus established is located at a distance of 85.63 chains on a bearing of true north from the southwest corner of Section 36. This position is that which best agrees with the natural objects described in the field notes and plat as being about it and found to exist on the ground and is that position which is least inconsistent with the distances mentioned in the notes from known corners and identified topographic items. Said position is the approximate location of Glover's northwest corner of Section 36 and is within very narrow limits the place where Glover actually placed his post for said northwest corner of Section 36. Said location is therefore the true northwest corner of Section 36, southwest corner of Section 25, as surveyed and established by the official United States survey made by J. R. Glover in May, 1883. . . . 21. The approximate and practically precise position in which Glover established the northeast corner of Section 36 (southeast corner of Section 25) can be reestablished by measuring the Glover distance of 80.12 chains North 0° 6′ 20″ West from said southeast corner of said Section 36. Said position so established is the approximate and practically the precise position in which Glover originally located said corner and is the true northeast corner of said Section 36 (southeast corner of Section 25) as established by said United States Government survey made by Glover in May, 1883."

Plaintiffs' principal assaults upon these findings disclose various facets of a central theme, namely, that the court must follow and apply sound surveying principles in locating corners and boundaries. Plaintiffs' counsel contend: "In order to determine the south boundary of the south half of Section 25 a survey of the section was required." To this they add the assumption and assertion that the court must make such a survey in order to reach a correct result, arguing, "the Court's Locations for the Northeast Corner of Section 36 and the Northwest Corner of Section 36 Were Required Under the Law to Be Supported by Expert Testimony," and "we are involved with the problem of whether the court applied legal

surveying methods to restore otherwise lost positions." However, the question presented to the court in a boundary dispute is not that of making a resurvey but one of determining as a question of fact from the preponderance of expert and nonexpert evidence (as in all other civil cases) the actual location of the monuments, corners or lines as actually laid out on the ground by the official surveyor. "Although without final authority, the surveyor when employed on a resurvey must act as judge and jury, collecting the evidence, hearing the testimony, interpreting the law and then making a decision consistent therewith. Questions relative to faulty surveys, obliterated monuments, contradictory testimony, disputed boundaries, riparian rights, inconsistent deed descriptions, erroneous plats, and legal decisions may be involved." (Clark on Surveying and Boundaries, second edition, introduction ix.) "The authorities are agreed, in such controversies, that any testimony tending to show the location of the line as established by the government survey is admissible, and the parties are not limited to the expediency of having the line established by a surveyor. ▮▮ 'In cases of disputed boundary, all evidence, whether documentary or parol, which bears upon the point in issue and which is not inadmissible on general principles, may be received in evidence, including records of original proprietors, their plans and maps and the location of lands by ancient settlers.' " (*Pounders* v. *Nix*, 222 Ala. 27 [130 So. 537, 538].) To the effect that this is a sound principle, see 8 Am.Jur. § 94, p. 812; 11 C.J.S., § 105, pp. 698, 703, § 116, p. 714, § 117, p. 727. ▮▮ In section 108 of 11 C.J.S. it is stated at page 704: "Lines actually run and marked on the ground may be proved by any evidence, direct or circumstantial, competent to prove any other disputed fact, and where markers of the original survey have been destroyed, secondary evidence as to the authenticity of their relocation is admissible." California recognizes these rules to be sound. In *Weaver* v. *Howatt*, *supra*, the court stated (161 Cal. at 84): "While it is true that the errors in the field-notes and plat make it impossible to locate the exact spot fixed by the official survey as the common corner of sections 1, 2, 11 and 12, in the absence of the monument set to mark it, yet there is ample evidence to show that it was not fixed at or near the place selected by the court, upon its theoretical subdivision of the line. It is not the province of the court to determine where the corner should have been fixed. This is not an action to vacate the government survey.

It must be assumed that the line was measured and the monuments set. Their positions, as set, fix the rights of the parties, regardless of the inaccuracy of the measurements and the errors in distance found in the field-notes. The trial court must ascertain, as near as may be, where this monument was set by the government surveyor.'' The court further stated (p. 86) : ''It is for the trial court, upon all the evidence, to fix the place at a point where it will best accord with the natural objects described in the field-notes as being about it, and found to exist on the ground, and which is least inconsistent with the distances mentioned in the notes and plat.'' In the same case, reported in 171 Cal. 302, the court said, at pages 307-308 [152 P. 925] : ''The court is bound to assume that the line was run on the ground and that the post was set in a mound of stones at a place fixed for the common corner of the four sections as the field-notes show. All trace of that monument has disappeared, and the exact place where it was erected cannot now be identified. But under the above rules these circumstances do not destroy the survey nor justify the court in disregarding it, when enough can be ascertained therefrom and identified on the ground to approximately locate the corner. . . . The court, under the above authorities, and in obedience to the former decision of this court, could not do otherwise than as it did, that is, fix the corner 'at a point where it will best agree with the natural objects described in the field-notes as being about it, and found to exist on the ground and which is least inconsistent with the distances mentioned in the notes and plat.' . . . It may well be, as appellants say, that this location of the corner will set all awry the shapes of the sections and subdivisions affected thereby. This is, unfortunately, a not infrequent result of inaccurate, careless, or fraudulent surveys. But the government owned the land, caused the survey to be made, and sold the land by reference thereto. Purchasers must abide by the result regardless of the lack of rectangular form or regular shape of the subdivisions so made.''

The southeast and southwest corners of Section 36 are established corners with monuments in place, and all parties agree upon their locations. The latitudinal line joining those corners is the south township line, and the one running north on the east side of Township 10, forming the east boundary of Sections 25 and 36, is the range line. The trial judge followed Glover's notes and plat and applied them to the terrain, making allowance for errors, and located the

northwest corner and the northeast corner of Section 36 (which are the southwest and southeast corners of Section 25) to his satisfaction, drawing the common boundary on a straight line between them.

The court in following Glover's footsteps found some errors, mostly in recorded distances, made proper adjustments therefor, in accordance with the rules of section 2077, Code of Civil Procedure, which provides in part: "The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful and there are no other sufficient circumstances to determine it:

"1. Where there are certain definite and ascertained particulars in the description, the addition of others which are indefinite, unknown, or false, does not frustrate the conveyance, but it is to be construed by the first-mentioned particulars.

"2. When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount."

Of course this means monuments which are known (or proved) to be the actual monuments of the survey. (*Golden* v. *City of Vallejo*, 41 Cal.App. 113, 119 [182 P. 347]; *Pauly* v. *Broadnax*, 157 Cal. 386, 395-397 [108 P. 271].) ▆▆▆ The mere fact of errors in an official survey does not preclude a lawful result for, as shown by the above quotations from the Weaver case, the official survey creates corners and boundaries and cannot be impeached by proof of negligence, mistake or even fraud on the part of the government surveyor. (*Phelps* v. *Pacific Gas & Elec. Co.*, 84 Cal.App.2d 243, 247 [190 P.2d 209]; *Weaver* v. *Howatt, supra,* 171 Cal. at 305.) ▆▆▆ The task of the court, when confronted with an obliterated corner, uncertain boundary location and the like, is to "decide from the data appearing in evidence its approximate position" when the exact spot cannot be found, and "fix the place at a point where it will best accord with the natural objects described in the field notes as being about it, and found to exist on the ground, and which is least inconsistent with the distances mentioned in the notes and plat." (*Weaver* v. *Howatt, supra,* 161 Cal. at 86.)

Glover started the pertinent portion of his survey at the southwest corner of Section 36 and proceeded to run the west line of that Section and Section 25. The findings state: "Said west line as recorded in said survey and in fact is a line

running true north from said southwest corner of said Section.'' The field notes say: ''I run North between sections 35 and 36.'' ''The word 'north,' unless qualified or controlled by other words, means due north, and that is its meaning in the deed under consideration. 'The term ''northerly,'' in a grant, where there is no object to direct its inclination to the east or west, must be construed to mean ''north.'' ' '' (*Currier* v. *Nelson,* 96 Cal. 505, 508 [31 P. 531, 746, 31 Am.St. Rep. 239].) Plaintiffs concede that the notes show this west line as running a course of true north. ▇ There is a presumption that the surveyor's notes are correct and that he did what he said he did,—in this instance that he ran a true north course. (*Pauly* v. *Broadnax, supra,* 157 Cal. 386, 396; *Golden* v. *City of Vallejo, supra,* 41 Cal.App. 113, 120.) In the absence of preponderant evidence to the contrary, this presumption is enough to support the finding. (*Estate of Wiechers,* 199 Cal. 523, 530 [250 P. 397]; *Scott* v. *Burke,* 39 Cal.2d 388, 397-399 [247 P.2d 313].)

▇ The area in question is rugged, mountainous topography. Recorded distances are the less persuasive elements of a survey and must yield to known natural monuments. As the judge walked a true north course he found the monuments of Glover so located as to be ''unmistakably identifiable upon the ground without any uncertainty at all,'' though not conforming exactly to Glover's measurements.

The next call of Glover's notes is: ''Ascend. 31.00 Top of spur, bears east and west and descend.'' The court found a definite ascent to the top of the spur which was identifiable on the ground at a location ''fixed with such certainty that it would be practically impossible to be mistaken about it.'' This spur was found at a distance of 31.26 chains north of said southwest corner; from that point ''there is upon the ground a descent to the next described item of topography.''

Glover's notes next state: ''67.57 Cross gulch 10 links wide, course northwest and ascend.'' The court found that the gulch is ''identifiable on the ground without any doubt or uncertainty whatever,'' intersected by said west line at a distance of ''73.20 chains north of the southwest corner of Section 36''; that it is the only gulch crossed by said west line in the area which fits Glover's description; that there is an ascent from the bottom of said gulch to the top of a spur bearing northwest and southeast.

Glover's next call is: ''70.00 Top of spur, bears northwest and southeast and descend. 80.00 Set a post . . . for corner

to sections 25, 26, 35 and 36. . . .'' The findings state that the field notes call for a descent from the top of this spur continuing for the entire west line of Section 25; that in fact there is such a descent for a distance well in excess of one mile; also, that Glover's distances of 67.57 and 70 chains are incorrect, but the said calls otherwise are correct and unmistakably identifiable on the ground, being erroneous as to distance alone. The court further found that the distance of 12.43 chains, shown by the notes and plat, from the gulch to the corner at 80.00 chains is correct; that the place where Glover actually placed his corner post (southwest corner of Section 25) can be established approximately and within very narrow limits on the line bearing true north from the southwest corner of Section 36; and that this location is fully corroborated by the fact that it conforms to three identified, fixed and certain topographic features called for by Glover west of said corner on the north line of Section 35. Then follows the ultimate fact or conclusion that the northwest corner of Setcion 36 ''thus established is located at a distance of 85.63 chains on a bearing of true north from the southwest corner Section 36.

Opposed to these findings plaintiffs argue vigorously the superior merit of the technical and theoretical processes and conclusions of their surveying experts. They make much of conflicts in position of the true north line and the fact that any one of those pursued by their witnesses would cross the natural monuments identified by the court. At best this rises to the dignity of constituting a conflict in the evidence and bears upon the east-west position of the disputed corner. But, as the problem is the north-south position of that corner, a variation in the east-west position can have little influence upon the latitudinal location of the boundary. In his opinion the court stated: ''Latitudinally, the course of Glover's west line of Section 36 is fixed and established with certainty.'' Plaintiffs' witnesses Myers and Wilson placed that northwest corner in the bottom of the gulch, which is 73.20 chains north of the point of beginning, thus rejecting the subsequent Glover calls ''ascend'' to ''top of spur'' and then ''descend'' to corner post set by him. McGregor placed his monument for this corner on the south slope of the ridge or spur, rather than beyond the top of the spur and down its north slope, as indicated by Glover.

Plaintiffs state that '' [f]ew facts are disputed, but vigorous conflicts developed concerning inferences each side contended

should be drawn from such undisputed facts." Applying the rules of review summarized in *New* v. *New*, 148 Cal.App. 2d 372, 383 [306 P.2d 987], we are unable to find a legal insufficiency of the evidence to support the court's location of this northwest corner, or the northeast corner of Section 36 hereinafter discussed. It is said in *New* v. *New*: "The appellate court must accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence. 'And where appellant urges the insufficiency of the evidence to sustain the findings . . . the rule is that, "Such contention *requires defendants to demonstrate* that there is no substantial evidence to support the challenged findings." (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].) (Emphasis added.) It is said in *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183], that "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deduction for those of the trial court."' (*Hartzell* v. *Myall*, 115 Cal.App.2d 670, 673 [252 P.2d 676].)" (P. 383.)

There were three government surveys in this immediate area. First that of Robert W. Norris in 1854; he established the range line between Townships 27 and 26. This survey was superseded by an official survey of the boundaries of Cuyama Rancho made by Robert R. Harris in 1872. The third was that of Glover in 1883. Norris set a monument at the northeast corner of Section 25 and he is the only one who did that. His record shows that he ran the range line as a straight course from the southeast corner of Section 1 to the southeast corner of Section 36. That range line is also the east boundary of Sections 25 and 36. When Norris established it he set a monument for the northeast corner of Section 25 and gave it a distance of 160.50 chains from the southeast corner of the Township (southeast corner of Section 36). This monument was found and adopted by Harris and by Glover. Glover adopted the range line of Norris as the east line of Sections 36 and 25. Harris had found Norris' stake for the southeast corner of Section 25 on the range line at a distance of one mile from the southeast corner of Section 36. One

mile north of that he found Norris' stake for the northeast corner of Section 25 at a distance of one mile from the southeast corner of Section 25. Glover followed that same range line north from the southeast corner of Section 36 (a distance of 80.12 chains, slightly more than a mile) and set a stake for the northeast corner of Section 36, thence north another 80.12 chains to Norris' northeast corner of Section 25. Norris had also run an offset line from the southwest corner of Section 19 (which adjoins Section 30 on the north) directly east to the northeast corner of Section 25 and recorded it as being two miles north of the south line of the Township (southeast corner of 36). These three surveyors left no room for any shortage in the line from the northeast corner of Section 25 to the southeast corner of Section 36.

The east boundary of the two sections is not so well supplied with natural monuments as the west, but there are enough to constitute persuasive evidence of the correctness of the court's location of the northeast corner of 36 or southeast corner of 25.

The court established that corner by following the range line from the southeast corner of the Township and Section 36 (a conceded location), a distance of 80.12 chains; this also took into consideration the calls of Glover's notes for courses and distances. Norris gave the northeast corner of Section 25 a distance of 160.50 chains from the southeast corner of Section 36 (just 33 feet in excess of two miles). His corner was found and adopted by Harris and Glover. Harris recorded the same measurement. Glover recorded the distance from the southeast corner of Section 25 to the southeast corner of 36 as 80.12 chains. Glover set a stake at the southeast corner of Section 25 by retracing the surveys of Norris and Harris, running a straight line north from the southeast corner of 36 along the range line for a distance of 80.12 chains, thence another mile to the northeast corner of Section 25. Glover having adopted Norris' work in this respect, it becomes immaterial that Norris' survey was not made official, for the line as re-run was Glover's. To get the bearing of the range line the trial court retraced Norris from the southeast corner of the Township, or Section 36, to the only corner to the north which then could be established with reasonable accuracy, namely, the southeast corner of Section 1 in said Township 10 North, Range 27 West, a distance of about five miles.

The court found the true bearing of that line to be North 0°

06′ 20″ West, and concerning the southeast corner of Section 1 found that it "can be established with reasonable certainty and within very narrow limits from the calls in the Norris field notes. Said position of said corner is established by the calls to natural monuments which confine its position in four directions and which are identified on the ground in fixed and certain positions in reasonable conformity to the distance called for by the official field notes of said Norris survey of 1854." Following the specified course on the ground the court identified the Glover monuments and found: "20. . . . (a) Said field notes call for 'descend' running north from the southeast corner of Section 36. From the southeast corner of Section 36 there is a definite descent upon the ground as one proceeds northerly on the east line of said Section 36. (b) Said field notes call for 'enter rolling land' at 60 chains north from the southeast corner of said Section 36. This item of topography is identifiable on the ground; said item is encountered on the east line of Section 36 at a distance of 60.19 chains northerly on said east line of said Section 36 from said southeast corner of said section." Then follows the ultimate finding that the "approximate and practically precise position in which Glover established the northeast corner of Section 36 is 80.12 chains North 0° 6′ 20″ West from said southeast corner of said Section 36." The terrain is entirely consistent with the Glover field notes. Were this a mere surveying problem, the fixing of the obliterated corner by following courses and distances from the nearest established corner (southeast corner of Section 36) would be proper. (*Gordon* v. *Booker*, 97 Cal. 586, 589 [32 P. 593]; *O'Hara* v. *O'Brien*, 107 Cal. 309, 315 [40 P. 423]; *Blackburn* v. *Nelson*, 100 Cal. 336, 338 [34 P. 775].)

The opposing evidence is of the same general character as that relating to the northwest corner of Section 36 which we have discussed. The differences developed by the witnesses pertain principally to the lateral position of the corner common to 36 and 25 on the east boundary, differences which have relatively insignificant influence upon the latitudinal boundary line running from the west corner to the east corner. For instance, defendants' witness Wattles adopted a bearing of North 0° 25′ 40″ West for the range line, with the result that his southeast corner of Section 25 is 50 feet east of the location fixed by the court. The insignificance of this difference is especially plain in the light of the stipulation that the judgment shall describe all boundary lines of Sections 25 and

36 other than the common boundary "by reference to the patents of the respective parties and the official plat of Sections 25 and 36, T. 10 N., R. 27 W., S.B.M. on file in the Bureau of Land Management, United States Department of the Interior." Applying the rules above quoted from *New* v. *New, supra,* we are able to discern nothing more than a substantial conflict in the evidence, which the trial court has resolved adversely to the plaintiffs.

If perchance there is any shortage in the line extending from the northeast corner of Section 25 to the southeast corner of Section 36, this relocation of the south boundary line of Section 25 at a distance of approximately one mile (the theoretical distance between section corners) from the southeast corner of Section 36 automatically throws the shortage into Section 25. ▇▇▇ In such case proportionment is not applicable, for "[it] has been held that a shortage of distance in a block will not be apportioned among all lot owners where facts and circumstances specifically locate the shortage. [Citation.]" (*Balestrieri* v. *Sullivan,* 142 Cal.App.2d 332, 338 [298 P.2d 688] ; see also *James* v. *Drew,* 68 Miss. 518 [9 So. 293, 24 Am.St.Rep. 287] ; Clark on Surveying and Boundaries (2 ed.) § 177, p. 178.)

ALLEGED ERRORS IN RULINGS

▇▇▇ In 1950, at the request of the lessee of a part of Section 34, Township 10 North, Range 27 West, the Regional Cadestral Engineer of the United States Bureau of Land Management in San Francisco, Mr. Swanholm, ordered Engineer Robert F. Wilson to make a resurvey of Sections 25, 26, 27, 34, 35, 36, of said Township for the purpose of reestablishing the Glover survey. His instructions stated in part: "Extensive retracement and investigation by Government and commercial agencies supplemented by unofficial, but authentic original source date of the original contract Deputy Surveyors Glover and Norway, conclusively prove this to be a survey that is at least partially fraudulent and fictitious." After the work was done, but before Wilson's survey had been approved officially (before he had even prepared a plat), Richfield protested and Mr. Swanholm, who had been ignorant of the pendency of the instant litigation when he ordered the survey, restored it to the status of an investigation and directed Wilson to remove certain of his monuments, which he did. The Wilson survey thus remained at the time of trial subject to change and never approved by the Bureau.

Plaintiffs offered Wilson's field notes as an official document and his testimony as that of an official explaining his authorized work. They relied upon the presumption "That official duty has been regularly performed." (Code Civ. Proc., § 1963, subd. 15.) The court ruled the section to be inapplicable but received the notes and testimony upon the same basis as those of a private surveyor. It is contended that this was serious error and that the judge was bound to review the evidence as fortified by the presumption that official duty has been regularly performed and hence as presumptively correct. The presumption in question has been characterized by the Supreme Court as "at best, 'weak and inconclusive.'" (*People* v. *Metropolitan Surety Co.*, 164 Cal. 174, 180 [128 P. 324, Ann.Cas. 1914B 1181]). We are asked to reverse the cause upon the theory that the trial judge did not give this evidence the weight to which it was entitled. Had he attributed the presumption to Wilson's work he would have been entitled to view the presumption as an imponderable having no real persuasive force in opposition to the other evidence seen and heard by him, and the practical result undoubtedly would have been the same. It is not our province to examine into the reasoning of the trial judge where the evidence warrants the inferences drawn by him.

Nor can we agree that the presumption arose from the circumstances here present. No government survey is complete or official until approved by the head of the bureau. Prior to that time everything done by the surveyor or within the bureau is tentative in the sense of being subject to change or correction. In our opinion the presumption does not apply to every act of the surveyor (e.g., mistakes he makes in the field and himself corrects), but only to those completed acts which have become official through approval by the head of the bureau. (*Cf. Medley* v. *Robertson*, 55 Cal. 396, 398-399; *United States* v. *Morrison*, 240 U.S. 192, 210, 212 [36 S.Ct. 326, 60 L.Ed. 599]; *Kendall* v. *Bunnell*, 56 Cal.App. 112, 122 [205 P. 78].) Cases arising under sections 1920 and 1926, Code of Civil Procedure, furnish a persuasive analogy. The former section provides: "Entries in public or other official books or records, made in the performance of his duty by a public officer of this state, or by another person in the performance of a duty specially enjoined by law, are prima facie evidence of the facts stated therein." And section 1926 provides: "An entry made by an officer, or board of officers, or under the direction and in the presence of either, in the course

of official duty, is prima facie evidence of the facts stated in such entry.'' It has been held repeatedly that those sections cannot have universal literal application (*Reisman* v. *Los Angeles City Sch. Dist.*, 123 Cal.App.2d 493, 506 [267 P.2d 36]; *Ogilvie* v. *Aetna Life Ins. Co.*, 189 Cal. 406, 409 [209 P. 26, 26 A.L.R. 116]; *McGowan* v. *City of Los Angeles*, 100 Cal.App.2d 386, 391-392 [223 P.2d 862, 21 A.L.R.2d 1206]; *Pruett* v. *Burr*, 118 Cal.App.2d 188, 200-201 [257 P.2d 690]). We perceive no error in the rulings concerning this matter.

Other asserted errors in rulings require no discussion.

### Conduct of Trial Judge

 Counsel for plaintiffs complain bitterly of the judge's treatment of them during the course of the trial. They charge the judge with being petulant, hostile and biased toward them and with prejudging the case. They assert that ''they were not accorded that minimum of civility and assurance of fairness recognized as the right of every party litigant and counsel. . . .'' Counsel cite certain instances where the judge used language which indisputably was inappropriate and lacking in the dignity and restraint which should characterize judicial expressions. However, the record refutes the charge of bias and unfairness on the part of the trial judge. Although the judge upon occasions was critical of counsel, particularly with reference to the extended duration of the trial, yet upon another occasion he complimented counsel for the excellence of a brief and commended him for his fairness.[8]

More importantly, the record demonstrates that the judge was liberal in affording counsel full opportunity to present their evidence,[9] cross-examine their adversaries' witnesses,[10] and argue their case.[11]

The judge's conduct must be evaluated in the light of the trial in its entirety. This was an important case with capable and experienced trial counsel on both sides. It was hotly contested throughout. Counsel were persistent in elaborating the factual picture in all its facets, in stating and restating their legal positions, which, upon several occasions, resulted in the court's changing its previously expressed tentative

---

[8]These remarks were directed to Mr. Blake, one of plaintiffs' counsel.

[9]Plaintiffs spent 136 days in presenting their case in chief and 21 days in rebuttal.

[10]They cross-examined defendants' witness Wattles for 46 days.

[11]The court allowed counsel for plaintiffs 10 days for their final argument.

views. The trial consumed 340 trial days. At the outset it had been estimated that the trial would not last more than four months. According to the judge there was public criticism of the extended duration of the trial. The case undoubtedly interfered with the disposition of other pending litigation. In such a setting it is understandable that a judge might become impatient and at times exasperated and make comments that were ill advised. But with it all, the record shows that the trial judge made a diligent and sincere effort to ascertain the truth and to apply correct legal principles throughout the trial and in his final decision, albeit he erred, as we have pointed out, in certain particulars. There is no basis for saying that the judge prejudged the case. Nor can it properly be said that the plaintiffs did not have a fair trial.

### MOTION TO TAX COSTS

Plaintiffs contend that the trial court erred in overruling their motion to tax costs as to the defendants' share of the expense for an extra copy of the reporter's transcript for use by the court during the trial. The cost of such copy was shared equally by the parties, and defendants included their half ($6,822.29) in their cost bill. Plaintiffs assert that even though it was agreed in open court that such copy should be furnished the judge at the joint expense of the parties, there was no stipulation that the prevailing party might tax its half as costs. The record is somewhat equivocal on this point, but the trial court held that there was such a stipulation. We are convinced that his construction of the record was reasonable and that the parties intended this cost item to come within their original stipulation concerning the taxability as costs of the expenses of a daily transcript. Hence, there is no error in the court's ruling.

The judgment is modified:

(a) by striking all of paragraph 2 thereof;

(b) by striking, in paragraph 1, the following language ''but for the existence of the agreed boundary and boundary by estoppel hereinafter established as the controlling boundary as between the parties to this action,'';

(c) by striking in paragraphs 3, 4, 5 and 6, the numeral 2 following the word ''paragraph'' in each instance in which such combination occurs, and substituting in each instance the numeral 1;

(d) by striking the word ''controlling'' in paragraphs 4 and 6 in each instance where it appears.

As so modified, the judgment is affirmed.

The order denying plaintiffs' motion to tax costs is affirmed. The taxable costs on appeal shall be divided equally between the appellants and respondents.

Herndon, J., concurred.

Mr. Justice Ashburn, being disqualified, does not participate herein.

A petition for a rehearing was denied December 10, 1958, and the opinion was modified to read as printed above. Ashburn, J., being disqualified, did not participate therein. Appellants' petition for a hearing by the Supreme Court was denied January 7, 1959. Carter, J., was of the opinion that the petition should be granted.