[Civ. No. 10005.   Third Dist.   Apr. 27, 1961.]

WARD H. HANES et al., Appellants, v. HOLLOW TREE LUMBER COMPANY (a Corporation) et al., Respondents.

Rawles, Nelson & Golden for Appellants.

Brobeck, Phleger & Harrison, Bailey Lang and Kasch & Cook for Respondents.

SCHOTTKY, J.—This is an appeal from a judgment in favor of the defendants, Hollow Tree Lumber Company, a corporation, Cloverdale Lumber Company, a corporation, Moores and Smith, a copartnership, William R. Zion, Betty O. Zion, Harry E. Zion, Vera K. Zion and Leela C. Zion, in an action brought by Ward H. Hanes and Ruth F. Hanes to quiet title to certain land in Section 6, Township 12 North, Range 14 West, M. D. B. & M. and for damages for conversion of timber.

It is undisputed that Ward H. Hanes and Ruth F. Hanes own Lots 3, 4 and 10 of Section 6, and that the Zions own Lots 5, 6, 7, 8 and 9 of Section 6. The dispute concerned the boundary on the south and west sides of Lot 10 and the south and west line of Lot 4.

The Haneses contended in the trial court that the boundary between the lands was as fixed by survey by one Russell Cummins. The defendants, referred to as the Zions hereafter, contend that the boundary was as fixed by a survey by Oscar Larson. The court accepted the survey made by Larson which made the claim for damages moot. Findings and judgment were entered accordingly and this appeal followed.

The evidence introduced in the trial court discloses that several different government surveyors made the survey of the section line between Sections 5 and 6. In the year 1875 one Perrin surveyed a portion of the line between Sections 5 and 6 by running from the southeast corner of Section 6 north some 40 chains, where he set a quarter section corner. He then went north some 20 chains, where he discontinued the survey. His field notes state that the land was mountainous and of no value. In 1877 a surveyor named Tolman surveyed the south boundaries of Sections 35 and 36 of the township and immediately to the north of Section 6, and he set the

660

quarter section corner of Section 36. (This corner was located and its location stipulated.) In 1883 one Berdan commenced the survey of the line between Sections 5 and 6. He ran from the southeast corner of Section 6 north 40 chains. He could not find the quarter section corner set by Perrin. He reset the quarter section corner between Sections 5 and 6, and at a later time he closed the line.

In 1955 some of the respondents engaged Oscar Larson, a civil engineer, to survey Section 6 to determine the boundary between the lands of appellants and respondents. Donald Bushnell, Larson's employee, a licensed surveyor, traced the survey of one Norway, a government surveyor, who surveyed the west line of Section 6. Bushnell traced Norway's field notes from the original monument marking the southwest corner of the section for a distance of one and three-quarter miles. The calls to the Garcia River were good, and the call some 225 feet north of the river was good as a line tree was found as called for in the field notes. Beyond the line tree the calls are in conflict. The notes say that at a point 6.30 chains north of the line tree "Leave timber and enter brush." Neither Bushnell nor any other witness was able to identify the line of demarcation between brush and timber. The field notes then said that at 7.30 chains north of the line tree the south line of Section 35, Township 13 North, Range 15 West, was intersected and a monument, a post in the ground, was set. This point was 7.10 chains east of the quarter section corner on the south line of Section 35. Actually, the south line of Section 35 is some 53 chains north of the true line, and from the line tree to a point 7.10 chains east of the quarter section corner of the south line of Section 35 one must travel some 90 chains. Bushnell and Larson rejected the call referring to the quarter section corner and accepted the call for north.

Bushnell also retraced the east line of Section 6. Here the portion in dispute is the portion between the quarter section corner and the closing corner on the south line of the township to the north. This portion of the line was surveyed by Berdan. He said that he ran north on a true line from the quarter section between Sections 5 and 6 on the line between the sections. As far north as the Garcia River the calls were adequate. Again a discrepancy appeared after the river was crossed. The field notes say the point of intersection with the south line of the section was to the north 29.32 chains north of the river and 7.82 chains east of the quarter section corner on the south line. The township line is 59.4 chains north. If

one goes to a point 7.82 chains east of the quarter corner, one travels northwest and the distance is 110 chains. Bushnell and Larson preferred the call north over the call for distance and direction.

Appellants claim the Bushnell-Larson survey was not in accordance with law. Appellants contend that Bushnell and Larson conducted a resurvey rather than retracement of the government survey. In this regard it should be noted that a government survey establishes the boundaries and does not merely identify them, and the government survey cannot be impeached by proof of fraud, negligence or mistake on the part of the government surveyor. In the instant case we have a most unusual situation. The distances called for do not go to the boundary of the section to the north. If the quarter section corner is used, the distance traversed is greater and the course is not north but northwest. It is stated in the Manual of Surveying Instructions (1947), published by the United States Department of Interior, Bureau of Land Management, at section 361: ''. . . In cases where the relocated corner can not be made to harmonize with all the calls of the original field notes, due to unexplained discrepancy which is made apparent by the retracement, the engineer is required to determine which calls will be given major control, and those which must be subordinated.'' Here surveyors Bushnell and Larson had a choice between calls of equal dignity, both as to distance and course. They chose one and rejected the alternative which was based on the quarter section corner on the south line of Section 35.

The appellants on the other hand contend that one should follow the calls as far as possible but that you must close on the quarter section corners set by Tolman. Appellants' surveyor, one Cummins, took note of the closing call in Berdan's notes, accepted the call for 7.82 chains east of the quarter section corner on the south line of Section 36 as the basis of his work and reestablished the closing corner by the ''single proportionate method.''

The learned trial judge in his memorandum opinion made a careful analysis of the evidence and the law. We quote therefrom as follows:

''On the west line of Section 6 Larson went north from the southwest corner thereof to the last recognizable call in the government field notes beyond the Garcia River, then there being no further ascertainable calls except that of 'north,'

he continued north to the township line. On the east line of Section 6 Larson followed the calls from the southeast corner of said section north to the Garcia River. He could find no recognizable calls beyond that, so he followed the only call he could be sure of, and that was north to the township line. Cummins apparently made no attempt to follow the calls, even as far as the Garcia River. He started right out at the southeast corner of Section 6 and went on a straight line about 40 degrees off of a true north direction, ran many more chains than the notes called for, and in a different direction, and came out on a township line a mile westerly from where he would have had he gone north all the way from the corner he started from.

"There can be no doubt, and I understand all parties to agree, that the government field notes beyond the Garcia River are grossly incorrect, as to distances, and consequently as to courses. It does not seem possible that such errors could occur by one in the field. One can guess that parts of said lines were not actually run, but only estimated from afar (not good estimates either). It is the duty of a later surveyor to try and retrace steps of the original surveyor where such is possible. This, Larson attempted to do. Kenneth Cummins 'found no relation between the line I ran and the calls in the field notes.' Larson followed the call north, Cummins did not. It is pointed out his closing point was between two streams and a spur, which description is found in some of the field notes with reference to other political subdivision. However, this is far from being conclusive when we ascertain that in order to get there we must go along a line which leads us to a point a mile away from where it would be if the line went straight north from the southeast corner to the northeast corner there of said Section 6. And where the distance is so far off from the distance calls in the field notes and where it is not shown there were other places along the township line that could not qualify as coming within the same description there is not much left to go on in that regard.

"All the original government plats in evidence show the east and west lines of Section 6 to be straight lines north and south. The Larson line is a straight line north, the Cummins line is not. Such plats may be considered in the over all picture. Indeed, Russell Cummins testified, 'The original surveyor may have intended to run on a true line north until it intersected the boundary of the township next north.' If he made a correct survey, that is what he did. The Court is forced

to the conclusion that the great weight of the evidence shows that was what he did do. It would certainly be a peculiarly shaped section if the Cummins line was adopted as the east line thereof. Even so, if we were satisfied he had thereby traced the line of the original surveyor, that is the way it would have to be. But the evidence, including much of the testimony of Kenneth Cummins himself, shows that he did not do that. He ignored the calls of the field notes from the southeast corner northerly altogether and started out on a line by the single proportional method in a case where it was not authorized. Such a line cannot be adopted.

"The Court in the consideration of this case has studied a number of authorities which announce the following rules:

" '. . . [T]he proportional method is to be used only when no other reasonable method is possible and it must be so used that it does not contradict [n]or conflict with the official data that are not impeached, and which, when not impeached, confine the actual position within certain limits. . . .' (*Weaver* v. *Howatt,* 161 Cal. 77, 84 [118 P. 519]; *Chandler* v. *Hibberd,* 165 Cal.App.2d 39, 51 [332 P.2d 133].)

"Maps as well as field notes are evidence. (*Weaver* v. *Howatt, supra,* page 80.)

" ' "The word 'north,' unless qualified or controlled by other words, means due north, . . ." . . . There is a presumption that the surveyor's notes are correct and that he did what he said he did,—in this instance that he ran a true north course. . . . In the absence of preponderant evidence to the contrary, this presumption is enough to support the finding.' (*Chandler* v. *Hibberd,* 165 Cal.App.2d 39, 58 [332 P.2d 133].)

"While the original surveyor's notes here have been impeached in some ways, certainly the preponderance of the evidence does not show that he did not run 'north.'

"It must be held that Cummins was not employed to, and he did not, establish any legal boundary. He did not purport to follow in the footsteps of the original government surveyors. Larson did attempt to follow the original line. This latter is in conformity with the law. (*County of Yolo* v. *Nolan,* 144 Cal. 445, 448 [77 P. 1006]; *Phelps* v. *Pacific Gas & Elec. Co.,* 84 Cal.App.2d 243, 248 [190 P.2d 209].)

"To summarize, the Court must hold, and does hold, that the lines surveyed by Larson, rather than that surveyed by Cummins, are the correct lines of the boundaries involved."

We agree with this analysis. It is supported by the record and by the applicable law.

Appellants have contended that we must follow the field notes, wherever they take us, regardless of how strange the resulting subdivision may be. While this may be so, the question to be determined in the instant case is where do the field notes take us. The probabilities are that the correct interpretation is the one yielding a section line having some resemblance to what the surveyor set out to do. That probability seemed so strong to the court in *Goss* v. *Golinsky*, 12 Cal.App. 71 [106 P. 604], that it laid aside the usual preference for calls to natural monuments and preferred a call for courses and distances. In the Goss case the call was for a natural monument, a creek which actually could be found on the ground. The courses and distances would have produced a regular square section. The call for the creek, if accepted, would have extended the west line of the section 1,000 feet north of where it should have been located. The court acknowledged that, generally, a call for a natural monument had precedence over courses and distances but here it rejected the call to the creek, saying at page 75:

"There can be no basis for holding that without reason the United States surveyor, departing from the usual custom, should locate this particular ground in the shape of a distinct trapezoid, increasing the area of section 33 and correspondingly diminishing that of section 28 and introducing irregularity and inequality into the survey where uniformity and continuity are supposed to be observed as far as possible. . . . Whenever precedence is given to a call for a monument or natural object over a course of distance, it is because the former is considered more reliable evidence than the latter of the actual survey. But in the case at bar, without doing violence to the competency of the surveyor, it is impossible to conclude that he actually located said creek as the terminus of said call in the deed, since a mistake of over one thousand feet in the distance would not be made if any degree of care or skill were exercised. If he had in view this natural object, it is more reasonable to infer that he observed it from a remote point and guessed at its distance than that he actually located it by the survey."

We believe that the court was justified in concluding that the use of proportionate measurement to relocate the closing corner was improper because of gross error in the field notes. Appellants rely upon the Manual of Surveying Instructions (1947) issued by the Bureau of Land Management as authority for the use of proportionate measurement. But the very

authority relied upon rejects that method when gross error is found in the notes. The Manual, section 378, after describing the use of proportionate measurements says:

"An entirely different problem must be faced in those situations where, on extensive retracement and study, it becomes evident that the record tie from the closing corner to the monument called for in the field notes is either wholly fictitious, grossly in error, or carries some irreconcilable discrepancy. This is an extremely unfortunate situation when it occurs, but it must be dealt with. . . . *No general rule can be advanced.* . . ." (Emphasis added.)

And section 385 reads: "Experience, thoroughness, and good judgment are indispensable for the successful retracement and recovery of any survey when it reaches a stage of extensive obliteration. It is an axiom, however, among experienced cadastral engineers, that if the original survey was made faithfully, and was supported by a reasonably good field-note record, the true location of the original lines and corners can be restored. That is the problem for which the basic principles have been outlined, and for which the rules have been laid down. The text must be discontinued at that point, as the rules can not be elaborated so as to be applicable for the reconstruction of a grossly erroneous survey, or for a survey the record field-notes of which are found to be fictitious. . . ."

In the instant case the trial court was confronted with the question of which survey should be adopted by the court, and we are convinced that the evidence and the law support the conclusion of the court that "the lines surveyed by Larson, rather than that surveyed by Cummins, are the correct lines of the boundaries involved."

The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied May 23, 1961, and appellants' petition for a hearing by the Supreme Court was denied June 21, 1961.