[Civ. No. 29467. First Dist., Div. Two. Dec. 23, 1971.]

STATE OF CALIFORNIA, Plaintiff, Cross-defendant and Appellant, v. MATT THOMPSON, Defendant, Cross-complainant and Respondent; A. J. GRAY, INC., et al., Cross-defendants and Appellants.

## COUNSEL

Evelle J. Younger, Attorney General, Sanford N. Gruskin, Assistant Attorney General, and R. H. Connett, Deputy Attorney General, for Plaintiff, Cross-defendant and Appellant and for Cross-defendants and Appellants.

Petersen, Lonergan & Larson, Robert C. Petersen and James L. Larson for Defendant, Cross-complainant and Respondent.

## OPINION

**ROUSE, J.**—The People of the State of California (hereafter "State"), as the owner of certain real property located in Mendocino County, brought this action for timber trespass against defendant Matt Thompson. The State alleged that defendant Thompson had wrongfully entered upon its property and had cut and removed timber valued at $1,000. The State sought to enjoin defendant from trespassing and also sought to recover treble damages in the amount of $3,000.

Defendant Thompson answered, denying the material allegations of the complaint. He also cross-complained against the State, A. J. Gray, Cloverdale Plywood Co. and Farley & Loetscher Manufacturing Co. (Cloverdale's successor in interest). Thompson claimed ownership of real property adjacent to the State's, and he alleged that cross-defendants had damaged his real property in the sum of $9,400 and had removed, damaged or destroyed timber valued at $102,543.50. Thompson sought to recover the actual damage to the real property, plus treble the timber damage, praying for a total award of $317,030.50.

The case was tried before a jury. The parties had jointly moved for a bifurcation of the issues pertaining to liability and damages, and the case was therefore tried in two stages. The liability phase of the case was tried first, and the jury was asked to answer a special interrogatory as to the location of the disputed boundary line between the real property owned by the State and the property owned by Thompson. The jury found that the boundary was as contended by Thompson.

Following the damages phase of the trial, the jury was asked to answer a second special interrogatory as to the amount of damages caused to Thompson's trees, timber and underbrush by cross-defendant. The jury found the damage to be $37,098.12.

Judgment was thereafter entered in favor of Thompson and against the State in the amount of $37,098.12, plus 7 percent interest from September

29, 1964. As against the remaining cross-defendants, Thompson was awarded double damages in the amount of $74,196.24, plus 7 percent interest from September 29, 1964.

A timely notice of appeal from the judgment was filed by all cross-defendants.

The evidence produced at the trial shows that the liability issue turns upon the proper location of the boundary between the northeast quarter and the northwest quarter of Section 7, Township 17 North, Range 16 West, Mount Diablo Base and Meridian, in Mendocino County. The State owns the northeast quarter of section 7 and Matt Thompson owns the northwest quarter of said section. The parties disagree as to the location of the boundary between their adjoining properties and each claims that the other has trespassed in the course of logging operations conducted in the area of the disputed boundary.[1]

The State acquired the northeast quarter of section 7 from the Casper Lumber Company. In 1963, the State sold timber in the northeast quarter to Cloverdale, which in turn contracted with Gray to do the logging. Prior to the commencement of the logging operations, the State undertook to place markers along what it believed to be the boundary between the northeast and northwest quarters of section 7.

On at least three occasions in 1964, Thompson, who disagreed with the State's location of the boundary, crossed the line marked by the State and cut timber east of the State's markers.

The evidence bearing upon the proper location of the disputed boundary shows that the original government survey of section 7 was made during the period between 1866 and 1876. The west boundary and corners of the section were set by William Carlton in 1866 when he established the range line 17 west. Later the same year, Isaac Chapman surveyed the south boundary of section 7. In 1868, T. S. Towle set out to survey the east boundary of the section. Towle's field notes indicate that he proceeded 31 chains north between sections 7 and 8 and set the quarter corner at that point, nine chains short of the half mile. He then discontinued his survey, observing that the country to the north was "unsurveyable."

Eight years later, in 1876, the remainder of section 7 was surveyed by Woods. According to his field notes, he commenced his survey at the quarter corner which Towle had set between sections 7 and 8. Woods proceeded north one-half mile and set the northeast corner of section 7.

---

[1]See explanatory diagram, Appendix "A."

He then ran east between sections 5 and 8 and tied into the northeast corner of section 8. Returning to the west, he set the quarter corner between sections 5 and 8. He continued west to the northeast corner of section 7, which he had previously set, and then went another 40 chains west and set a temporary quarter corner between sections 6 and 7. He continued on to the west until, at 79.92 chains, he intersected the west boundary of the township (and of section 7) 51 links south of the northwest corner of section 7. After going to the northwest corner of section 7, he proceeded east again and set his permanent quarter corner between sections 6 and 7, at a point 25 links north and 8 links west of his temporary corner. He called two bearing trees, a hemlock 12 inches in diameter bearing north 59 degrees west at 61 links, and a black oak 19 inches in diameter bearing south 55 degrees at 79 links.

In 1895, Francis Gorlinski, who was employed by the Caspar Lumber Company, conducted a survey along the line between sections 6 and 7. Gorlinski's field notes state that he identified Woods' quarter corner by means of the hemlock bearing tree, which was still standing and plainly marked. He stated that the corner itself had been destroyed. The oak bearing tree had rotted away, but the stump remained in the location specified by Woods. Gorlinski reestablished the corner by setting a post and marking two bearing trees, a pine and a redwood. Both trees were marked "¼ S C L Co. BT."

In 1902, Fred Stickney subdivided section 7 for the Caspar Lumber Company by surveying straight lines between the east and west quarter corners and the north and south quarter corners. Where these lines intersected, he set a stake for the center quarter corner and marked a redwood stump. Stickney's field notes show that when he went to the quarter corner between sections 6 and 7, he found a plainly marked 12-inch "fir" on the bearing Woods had given for his hemlock. The oak bearing tree had been destroyed, but Stickney concluded from the condition of the earth that a large tree had stood in the proper location at one time. He found a stake "probably" set by Gorlinski.

In 1906, Harry Docker, while cruising timber for the Caspar Lumber Company, found a stake which was marked as the quarter corner between sections 6 and 7. He thought it odd that the stake was located only one-quarter mile east of the northwest corner of section 7 rather than a full one-half mile to the east as it should have been.

In 1939, Frank Lermond, who was also employed by the Caspar Lumber Company, perpetuated the quarter corner between sections 6 and 7 by setting a concrete post. Lermond's notes in connection with the perpetua-

tion state that he found the roots and suckers of Woods' oak tree. The hemlock was down. Lermond found Gorlinski's two bearing trees and stated that they were both standing and plainly marked.

In 1961, Knute Nelson surveyed certain property in section 5 for the State. His notes show that he tied into the northeast corner of section 7 and the quarter corner between sections 6 and 7. He believed the Lermond monument to be in the correct position for the latter corner, and he set a concrete monument at the spot which he identified as the northeast corner of section 7.

Oscar Larson, a civil engineer, was called as an expert witness by the State. Larson had attempted to relocate Woods' original quarter corner between sections 6 and 7 by matching Woods' calls to the topography. Larson started at the west quarter corner of section 7, proceeded north to the northwest corner of the section and then went east until he reached the Nelson monument for the northeast corner of the section. Larson then proceeded west from the Nelson monument in accordance with Woods' calls until he arrived at the Lermond monument for the quarter corner between sections 6 and 7. Larson found that the calls matched the topography quite closely. After reaching the Lermond monument, Larson continued on to the west and was less successful in matching Woods' calls. For example, a ravine and adjacent terrain called for by Woods at 58 chains was found by Larson at 64.8 chains. Larson reached the northwest corner of section 7 at 66.6 chains, whereas Woods had intersected the west boundary of section 7 at 79.92 chains. Larson explained this discrepancy by speculating that Woods had either made a mistake in his measurements or had run past the northwest corner of section 7 without seeing it.

Larson concluded from his survey that the Nelson monument was at the correct location for the original northeast corner of section 7 and that the Lermond monument was at the correct location for the original quarter corner between sections 6 and 7. Larson believed that Woods' calls approaching this corner from the east fitted the topography extremely closely. The Nelson monument also corresponded well with the location indicated in the government field notes for the northeast corner of section 7.

Larson was unable to find any evidence of the original government corners or of the original bearing trees at either the Lermond monument or the Nelson northeast corner to section 7. Although Larson found certain roots near the Lermond monument which he believed were from Woods' hemlock bearing tree, a sample from these roots was tested and found to be Douglas fir. Larson did find Gorlinski's two scribed bearing

trees at the site of the Lermond monument. The scribing on the fir was illegible, but the heartwood of the redwood still bore the scribing "¼ SCL Co. BT."

Larson accepted a rusted, broken-off pipe in the ground for the center quarter corner of section 7. The pipe was located 11.6 feet east of the intersection of straight lines connecting the east quarter corner with the west quarter corner and the south quarter corner with the Lermond monument. Eleven feet east of the pipe was a burnt redwood stump scribed to identify the center quarter corner and bearing the initials of Willis Corbitt, a surveyor who had worked in that area in the 1930's. The stump was located less than two feet in bearing and distance from the spot where Stickney had located his stump in 1902. Another stump located 31.4 feet from the pipe was also initialed by Corbitt and scribed to identify the center quarter corner of section 7. The scribings on the two stumps faced the pipe in the usual custom of surveyors marking bearing trees to identify a corner.

Larson concluded that the boundary between the northeast and northwest quarters of section 7 was a straight line between the pipe and the Lermond monument.

On cross-examination, Larson admitted that when he conducted his survey on the ground, he did not attempt to follow the precise route taken by Woods in setting either the northeast corner of section 7 or the quarter corner between sections 6 and 7. Woods had started his survey at the quarter corner between sections 7 and 8 and had proceeded on a true line north to set the northeast corner of section 7. He subsequently ran the line between sections 6 and 7 from east to west and then came back from the west to set the quarter corner between the two sections. Larson, on the other hand, started his survey at the quarter corner between sections 7 and 12, a mile west of Woods' starting point. Larson then went north to the northwest corner of section 7 and ran the line between sections 6 and 7 first from west to east and then back to the west. Larson never attempted to run Woods' line from the quarter corner between sections 7 and 8 to the northeast corner of section 7.

Larson admitted that his location of the northeast corner of section 7 at the Nelson monument did not correspond with Woods' notes to the effect that he had set that corner after proceeding north on a true line from the quarter corner between sections 7 and 8. Larson admitted that he accepted the established location of the quarter corner between sections 7 and 8, but that his location of the northeast corner of section 7 was definitely not directly to the north of that corner. In fact, Larson's graph showed his line to be 18 degrees and 32 minutes west of north, which he admitted to be a considerable discrepancy.

Larson also admitted that his location of the northeast corner of section 7 and the quarter corner between sections 6 and 7 did not correspond with Woods' notes as to the length of the north boundary and the width of the northwest and northeast quarters. Thus, Larson's quarter corner between sections 6 and 7 was 151.8 feet west of the spot where Woods stated that he set the corner. Larson's entire north boundary of section 7 was 874.4 feet shorter than Woods'. Larson's location of the corners renders the northeast quarter of section 7 (the property owned by the State) 171.6 feet wider than Woods' notes indicate and also renders the northwest quarter of the section (the property owned by Thompson) 1023.8 feet narrower than Woods' notes indicate. Larson's survey renders section 7 an irregular rather than a square section, although the government plats show the section to be entirely regular.

Thompson's expert witness, Norman Glover, disagreed with Larson's location of the northeast corner of section 7, the center corner of the section and the quarter corner between sections 6 and 7. Glover located his northeast corner of section 7 by proportionate measurement, placing it on a line between the quarter corner between sections 7 and 8 and the northeast corner of section 6. Glover found that Woods' calls to the north of Glover's northeast corner of section 7 matched the topography exactly. There was also evidence of very old intersecting fence lines where Glover located his northeast corner. Glover testified that Larson's location of the northeast corner could be reconciled with Woods' notes only by assuming that when Woods proceeded on his true line north from the quarter corner between sections 7 and 8, he in fact mistakenly went 17 degrees to the west; that he thereafter went directly north for some distance and then made another mistake and veered 17 degrees to the east. In Glover's opinion, it was inconceivable that this could have occurred. Glover checked the topography north of Larson's northeast corner and found that it did not fit the government calls at all.

Glover arrived at his location of the quarter corner between sections 6 and 7 by proportionate measurement between his northeast corner and the established northwest corner of the section. The topography immediately to the east and west of Glover's corner matched Woods' calls very well.

Glover located the center corner of section 7 at the intersection of the lines between the north and south quarter corners and the east and west quarter corners. He found an old rotten stake and very old intersecting

fences near the spot where he located his center corner. He also found a tree with old blaze marks on it.

Glover's location of the corners in question renders section 7 regular in shape and corresponds with the government plats. Glover's survey resulted in a north boundary of section 7 which was only 100 feet shorter than the distance called for in Woods' notes.

 The State and its coappellants take the position that the evidence is insufficient as a matter of law to support the judgment in respondent Thompson's favor. Appellants point out that respondent's expert witness, Glover, located his corners by proportionate measurement, and appellants contend that this method may not be resorted to unless it is impossible to locate the original corners by reference to the natural objects described in the field notes of the government surveyor who set the corners. Appellants assert that the evidence in the instant case shows that their surveyor, Larson, was able to retrace the original survey on the ground and was able to relocate the government corner between sections 6 and 7 by reference to Woods' topographical calls. Under such circumstances, appellants contend that the judgment, based upon Glover's location of the disputed boundary, is contrary to law and cannot stand.

Respondent, in reply to this contention, denies that his surveyor, Glover, determined the location of the corner between sections 6 and 7 by proportionate measurement. Respondent asserts that Glover determined the location of this corner by reference to the topography referred to in Woods' field notes. Respondent further asserts that Glover's location of the corner was superior to Larson's in matching Woods' calls and that Larson's survey was improper because he did not start from the same point where Woods started but traced Woods' line backwards. Respondent expressly concedes that appellants are correct in asserting that a corner may not be located by proportionate measurement when the corner can be found by reference to topography. However, respondent denies that the evidence in the instant case compels a choice between the two methods, and he asserts that the situation is merely one where the jury was called upon to determine which of the two surveyors had more accurately located the original government corner on the ground.

Respondent's contention that Glover did not locate the quarter corner between sections 6 and 7 by proportionate measurement is wholly unsupported by the record. Glover's testimony is not in the least ambiguous, and he clearly stated that he located all three of the disputed corners (the quarter corner between sections 6 and 7, the northeast corner of section 7, and the center corner of said sections) by the proportionate measurement

method. It is true that *after* setting these corners, Glover compared the immediate topography with the government field notes and concluded that it matched well. However, this comparison obviously did not serve to convert a survey based upon the proportionate measurement method into one based upon a retracing upon the ground of the government surveyor's original field notes. In fact, Glover's comparison of the surrounding topography can properly be viewed as a necessary part of a survey by proportionate measurement, since it is settled that this method must be so used that it does not contradict nor conflict with the official data that are not impeached. (*Weaver* v. *Howatt* (1911) 161 Cal. 77, 84 [118 P. 519]; *Hanes* v. *Hollow Tree Lumber Co.* (1961) 191 Cal.App.2d 658, 663 [12 Cal.Rptr. 713]; *Chandler* v. *Hibberd* (1958) 165 Cal.App.2d 39, 51 [332 P.2d 133].)

Since there is no merit whatever to respondent's contention that the Glover survey was not based upon the proportionate measurement method, the question remaining is whether appellants are correct in contending that this method should not have been utilized because it was possible to locate the quarter corner between sections 6 and 7 by reference to the topography described in the government field notes and other relevant evidence bearing upon the original location of the corner.

■ It is settled law that the proportionate measurement method may be used only as a last resort when the original corner is "lost" and cannot be relocated on the ground. (*County of Yolo* v. *Nolan* (1904) 144 Cal. 445, 448-449 [77 P. 1006]; *Weaver* v. *Howatt, supra,* at p. 84; *Chandler* v. *Hibberd, supra,* at pp. 51-52.) ■ A survey of public lands does not merely ascertain boundaries; it creates them. (*Robinson* v. *Forrest* (1865) 29 Cal. 317, 325; *Verdi Dev. Co.* v. *Dono-Han Mining Co.* (1956) 141 Cal.App.2d 149, 152 [296 P.2d 429].) A government township lies just where the government surveyor lines it out on the face of the earth. (*Harrington* v. *Boehmer* (1901) 134 Cal. 196, 199 [66 P. 214, 489].) "The line as surveyed and described in the field-notes is the description by which the government sells its land. If its description makes one section contain three hundred and twenty acres and another nine hundred and sixty acres, the parties must take according to the calls of their patents." (*County of Yolo* v. *Nolan, supra,* at p. 449.)

■ If the monuments set by the original government surveyor are obliterated and undiscoverable, the corner must, if possible, be located by reference to the natural objects and topography described in the field notes of the original survey. (*Wilmon* v. *Aros* (1923) 191 Cal. 80, 82-83 [214 P. 962]; *Weaver* v. *Howatt, supra; Chandler* v. *Hibberd, supra,* at p. 52.)

In *Reid* v. *Dunn* (1962) 201 Cal.App.2d 612 [20 Cal.Rptr. 273], the court discussed at length the various methods of relocating an obliterated corner and pointed out that such a corner could not be deemed a "lost" corner justifying a resort to the proportionate measurement method unless there was no possibility of locating the original corner on the ground. The court pointed out that under section 355 of the Manual of Surveying Instructions, a corner was merely obliterated and not lost if its location had been perpetuated or the point for the corner could be recovered beyond reasonable doubt by the acts and testimony of interested landowners, competent surveyors, other qualified local authorities or witnesses. Likewise, under section 360 of said manual, the corner would not be treated as lost if there was some "acceptable evidence" of its original location (p. 614).

In *Weaver* v. *Howatt, supra,* our Supreme Court reversed a judgment determining the location of a disputed boundary by the proportionate measurement method. The court held that the use of this method was not justified because the field notes of the original surveyor, even though extremely inaccurate as to distances, did give two topographical calls (one to a "steep descent" and one to his entry into "bottom land") which could be located on the ground (pp. 84-85). Under such circumstances, the judgment determining the location of the boundary by proportionate measurement could not be upheld.

In the instant case, the verdict and judgment determined the boundary between respondent's and appellants' land to be as contended by respondent, who relied solely on the proportionate measurement survey made by Glover. Respondent, in his brief, virtually concedes the impropriety of using the proportionate measurement method, since he has incorrectly attempted to argue that Glover located his corners by matching Woods' calls to topography more closely than did Larson. Disregarding the inaccuracy of this assertion, it is certainly of interest that respondent has chosen to make it. It is apparent that if Glover *could* have located his corners by reference to Woods' calls to topography, as respondent now suggests he could, he was clearly not justified in resorting to the proportionate measurement method to locate said corners.

Assuming that respondent has not conceded the impropriety of the proportionate measurement method, an examination of the record nevertheless discloses abundant evidence that the quarter corner between sections 6 and 7, as originally set by Woods, could be located on the ground by methods other than proportionate measurement.

First, there was a wealth of evidence that the corner in question had been reestablished by Gorlinski almost 70 years before the instant action was

commenced and that subsequent surveyors had all agreed that Gorlinski had correctly located the original government corner. Thus, Gorlinski's notes show that he found the corner in 1895, only 19 years after the original survey by Woods; that the hemlock bearing tree was standing and plainly marked and that the stump of the oak remained. Gorlinski marked a redwood bearing tree which is still standing today and which bears legible scribing. Stickney visited the corner in 1902, Lermond in 1939 and Nelson in 1961. All of them agreed that Gorlinski had properly located the original government corner, and Lermond reestablished the corner by setting a concrete monument.

In addition to the above evidence of the findings of past surveyors, Larson's testimony shows that it was still possible at the time of trial to locate the corner on the ground by following Woods' calls to topography. Larson, as noted above, approached the northwest corner of section 7 from the south, proceeded across the north boundary of section 7 first from west to east and then from east to west. Although respondent contends that Larson ought to have commenced his survey from the east in order to literally "follow in the footsteps" of Woods, this argument is without merit. A survey from the nearest established corner is least liable to error. (*Gordon* v. *Booker* (1893) 97 Cal. 586, 588-589 [32 P. 593].) Since the location of the northeast corner of section 7 was in dispute, it was clearly proper for Larson to commence his survey at the northwest corner of section 7.

Moreover, Larson's testimony shows that when he followed Woods' calls from east to west along the north boundary of section 7, in the route originally taken by Woods, Larson found that the topography corresponded remarkably well. Thus, Woods called for a stream 25 links wide running south 25 degrees east at a point 12.10 chains west of the northeast corner of section 7. Larson found the stream running in the proper direction, at 12.5 chains. Woods' next call, at 14.5 chains, was to the top of a ridge running northwest and southeast. Larson found the summit of a ridge running in the proper direction at 14.7 chains. At 18 chains, Woods called for a stream 20 links wide running southeast. Larson found a stream running in the proper direction at 19.4 chains. Larson testified that the two streams with the ridge between could be found in only one particular area. Glover himself admitted that the ridge and the two streams were readily locatable on the ground and that they were the proper distance apart to correspond with Woods' field notes. Glover further admitted that the ridge and streams did not correspond at all with the location of his corners, and his only explanation was that Woods had described their location in a totally inaccurate way and must have triangulated or traversed around them.

In view of the above evidence, it is apparent that the instant case was not one where a judgment could properly be based upon the location of a "lost" corner by the proportionate measurement method. Not only was there abundant evidence that the original government corner between sections 6 and 7 had been found and correctly reestablished on the ground 19 years after it was set, but it was also shown that Woods' field notes referred to readily identifiable features of the topography from which the original location of the corner should have been determined. ■ Although respondent contends that the calls to the ridge and streams were merely incidental, it is settled that incidental calls to natural objects may be resorted to where the locative calls have disappeared. (*Weaver* v. *Howatt* (1915) 171 Cal. 302, 308 [152 P. 925].) Certainly, they must be followed before resorting to the proportionate measurement method. Woods' calls to the ridge and two streams were unquestionably no less ambiguous than calls to a "steep descent" and the entry of "bottom land." Yet the Supreme Court held in *Weaver* v. *Howatt, supra,* 161 Cal. 77, that the existence of these calls, which could be found on the ground, vitiated a judgment determining the location of a boundary by the proportionate measurement method.

In the light of the foregoing, appellants' other contentions on appeal need not be discussed.

Inasmuch as the judgment for respondent was wholly and improperly based upon Glover's proportionate measurement survey, the judgment is reversed.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied January 21, 1972, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied February 16, 1972.

APPENDIX "A"

Location of Section 7

Adjacent Township Township 17 North Range 16 West

| | | | | | 1 | 6 | 5 | 4 | 3 | 2 | 1 |
| | | | | | 12 | 7 | 8 | 9 | 10 | 11 | 12 |
| | | | | | | 18 | 17 | 16 | 15 | 14 | 13 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Township Line

Area of Disputed Boundary

State's ) Section 7 (Thompson's
Claimed ) (Claimed
Boundary) (Boundary

| NW 1/4 | NE 1/4 |
| (Thompson) | (State) |
| SW 1/4 | SE 1/4 |